# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-3988

JOHN L. LAXTON,

*Petitioner-Appellant,*

*v.*

BYRAN BARTOW,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03 C 977—**William C. Griesbach**, *Judge.*

ARGUED MAY 10, 2005—DECIDED AUGUST 31, 2005

Before FLAUM, *Chief Judge,* and KANNE and WILLIAMS, *Circuit Judges.*

FLAUM, *Chief Judge.* Petitioner-appellant John L. Laxton was involuntarily committed to a secure mental health facility after a jury found that he was a sexually violent person as defined in the Wisconsin Sexually Violent Person Commitment Statute, Wis. Stat. § 980. Laxton appealed to the Wisconsin Court of Appeals and the Wisconsin Supreme Court, both of which affirmed his commitment. He then petitioned for a writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin, arguing that the commitment violated his substantive due process rights. The district court denied the writ, and Laxton appeals. We conclude that the Wisconsin Supreme Court's

adjudication of Laxton's due process claim was not contrary to or an unreasonable application of clearly established federal law and therefore affirm the district court's denial of the writ.

## I. Background

On October 13, 1994, Laxton was arrested while peeping into the window of a room occupied by two young girls. Laxton had a long history of sexual misconduct. At the time, petitioner was on parole after serving part of an eleven-year sentence for abducting and sexually assaulting two twelve-year-old girls. As a result of the window-peeping incident, Laxton's parole was revoked, and he was convicted of disorderly conduct. Shortly before his release from prison, on September 11, 1998, the state filed a petition seeking to commit Laxton as a sexually violent person under Wis. Stat. § 980. The statute defines a "sexually violent person" as:

> a person who has been convicted of a sexually violent offense, has been adjudicated delinquent for a sexually violent offense, or has been found not guilty of or not responsible for a sexually violent offense by reason of insanity or mental disease, defect, or illness, and who is dangerous because he or she suffers from a mental disorder that makes it substantially probable that the person will engage in acts of sexual violence.

Wis. Stat. § 980.01(7).

Wisconsin affords persons who are the subject of a commitment petition the right to a trial as well as "all constitutional rights available to a defendant in a criminal proceeding." *See* Wis. Stat. § 980.05. At petitioner's commitment trial, the state presented evidence of Laxton's long history of sexual misconduct. This evidence showed that Laxton began window peeping and exposing himself at the

age of twelve. In 1981, he was convicted of exposing his penis to a fifteen-year-old girl whom he stopped to ask for directions. In 1987, he was convicted of sexually assaulting two twelve-year-old girls whom he encountered delivering newspapers in separate incidents on the same morning. He approached the first girl and grabbed her in the crotch area and demanded oral sex before the girl managed to escape. Thirty minutes later, he encountered and attacked another girl. He dragged the girl behind bushes where he forcibly performed oral sex on her and placed his penis in her mouth until he ejaculated.

While serving his sentences for these offenses, Laxton was terminated from two sexual offender treatment programs for failing to make progress. Less than five months after his release on parole, petitioner was arrested for the window-peeping incident that triggered the state's commitment petition. Ironically, at the time of the October 13, 1994 incident, Laxton was undergoing sexual offender treatment and was reportedly "doing well." Laxton's parole agent testified that, according to petitioner, window peeping was a "red flag" for him, meaning it could lead to a new, more serious, offense. Petitioner also admitted at trial that he had committed several other acts of window peeping the same week before being caught.

Several experts testified at the trial. Dr. Timothy McGuire, a staff psychologist for the Wisconsin Department of Corrections, testified for the state and diagnosed Laxton with pedophilia, voyeurism, and paraphilia. He explained that pedophilia is characterized by "recurrent, intense sexually arousing fantasies, sexual urges, or behaviors involving sexual activities with prepubescent children." Voyeurism, Dr. McGuire explained, is essentially "window peeping for sexual gratification." Paraphilia, according to Dr. McGuire, refers to a variety of sexually deviant behaviors; in Laxton's case, it primarily referred to his exhibitionism, or instances in which Laxton exposed himself for

sexual arousal. Dr. McGuire testified that these conditions predisposed Laxton to engage in acts of sexual violence and that his repeated sexual offenses "clearly show an inability to refrain [from] acting on the sexual urges when they do occur." (Tr. Vol. 2 at 31.)

The state also called psychologist Dr. Sheila Fields, who diagnosed Laxton with paraphilia and exhibitionism, and also noted his cannabis abuse. She explained how Laxton's behavior progressed from voyeurism to exhibitionism to forcing sexual activity:

> With the voyeurism he feels a strong urge. He can't stop the urge to want to look in people's windows, to watch people who do not know they're being watched. He then becomes sexually excited, and he moves on to exposing his penis, his genitals. Once sexually excited, at least three times in his life that we know of, he's moved on to having sexual activity with someone who did not want to. That's—I believe is not necessarily . . . something that he wanted to do.

(Tr. Vol. 2 at 131-32.) Dr. Fields concluded that Laxton is predisposed to sexually violent behavior and has difficulty controlling his sexual urges.

Psychologist Dr. Michael Kotkin testified as an expert for the defense. Dr. Kotkin diagnosed Laxton with exhibitionism and voyeurism, and again noted his marijuana abuse. He did not, however, find sufficient evidence to support a diagnosis of either paraphilia or pedophilia. Although he opined that Laxton did not show a pattern of violent sexual behavior, Dr. Kotkin acknowledged that Laxton's two sexual assaults in 1987 could be a compelling predictor of future violent sexual offenses.

Finally, Laxton testified on his own behalf. He did not dispute the details of his prior sex offenses but testified that he would not commit another violent sexual act in the future.

Tracking the language of the statute, the court instructed the jury that the state had to prove three elements beyond a reasonable doubt before it could find Laxton a sexually violent person. First, the state was required to establish that Laxton had been convicted of a sexually violent offense. This element was not disputed. Second, the state had to prove that Laxton has a mental disorder, defined as "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to engage in acts of sexual violence." (Tr. Vol. 4 at 10.) The court further explained:

> Acts of sexual violence means acts which constitute sexually violent offenses. Acts of window peeping or exposure of the penis, absent any other behavior toward another person, do not alone constitute sexually violent offenses under Chapter 980.

> Not all persons who commit sexually violent crimes can be diagnosed as suffering from mental disorders, nor are all persons with a mental disorder predisposed to commit sexually violent offenses.

(*Id.* at 11.) Third, the state was obligated to prove that Laxton "is dangerous to others because he has a mental disorder which creates a substantial probability that he will engage in acts of sexual violence." (*Id.*) The court further explained that "substantial probability means much more likely than not." (*Id.*) Neither party objected to these jury instructions. After four days of trial, the jury returned a verdict finding that Laxton was a sexually violent person.

Laxton appealed from the judgment and order of commitment, arguing that the jury instruction defining sexually violent offenses was inappropriate. The Wisconsin Court of Appeals summarily affirmed the commitment, noting that Laxton had not preserved his objection to the jury instruction at trial. Petitioner then sought review in the Wisconsin Supreme Court, arguing that his commitment violated the substantive due process guarantees in the

United States and Wisconsin Constitutions because the statute did not require the jury to determine specifically that he had a mental disorder that involves serious difficulty in controlling his behavior. *In re Commitment of Laxton*, 647 N.W.2d 784, 786 (Wis. 2002).

The Wisconsin Supreme Court granted Laxton's petition for review, instructing both parties "to address whether Laxton's due process rights were violated because there was no jury determination regarding his level of volitional control." *Id.* at 788. Following briefing and argument, the Wisconsin court affirmed the commitment. Laxton then filed a petition for a writ of habeas corpus, arguing that the Wisconsin Supreme Court decision was contrary to or an unreasonable application of clearly established federal law. The district court denied the writ, but issued a certificate of appealability on the following questions: (1) whether petitioner's Fourteenth Amendment right to due process requires a jury determination that he has serious difficulty controlling his sexually dangerous behavior; and (2) whether the jury instructions in petitioner's case satisfied due process by informing the jury of its responsibility to make this determination.

## II.  Discussion

The Supreme Court has held that although freedom from physical restraint is "at the core of the liberty protected by the Due Process Clause," this interest may be overridden, even in the civil context, in certain limited circumstances. *See Kansas v. Hendricks*, 521 U.S. 346, 356 (1997) (quoting *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)). More specifically, the Court has upheld involuntary commitment statutes which "couple[ ] proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" *Id.* at 358 (citations omitted). As the Court explained, these statutory requirements "serve to

limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.*

In *Hendricks*, the Court upheld the Kansas Sexually Violent Predator Act (SVPA), noting that it "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior.*" Id.* The Court explained that the precommitment requirement of a mental disorder or personality disorder outlined in the SVPA is "consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." *Id.*

Several years later, the Court again addressed "the constitutional requirements substantively limiting the civil commitment of a dangerous sexual offender" in the context of the Kansas SVPA. *Kansas v. Crane*, 534 U.S. 407, 409 (2002). The Court concluded that the Kansas Supreme Court had interpreted *Hendricks* "in an overly restrictive manner" when it understood *Hendricks* to "insist[ ] upon 'a finding that the defendant cannot control his dangerous behavior'—even if (as provided by Kansas law) problems of 'emotional capacity' and not 'volitional capacity' prove the 'source of bad behavior' warranting commitment." *Crane*, 534 U.S. at 409, 411 (quoting *In re Crane*, 7 P.3d 285, 290 (Kan. 2000)). The Court clarified that *Hendricks* did not set forth a "requirement of a *total* or *complete* lack of control," *id.* at 411, and concluded:

> It is enough to say that there must be proof of serious difficulty in controlling behavior. And this, when viewed in light of such features of the case as the nature of the psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness,

abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case.

*Id.* at 413.

Petitioner argues that the Wisconsin Supreme Court decision affirming his commitment was contrary to and an unreasonable application of *Hendricks* and *Crane* because it upheld his commitment without a specific jury instruction or finding that he had serious difficulty in controlling his behavior.

Petitioner's habeas claim is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), which provides in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to . . . clearly established Federal law" when the court reached a conclusion "opposite to that reached by [the Supreme] Court on a question of law" or confronted "facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).

An "unreasonable application of [ ] clearly established Federal law" results when a court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* at 407-08. Under the "unreasonable application" prong, a federal court may not issue the writ "simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, that application must also be objectively unreasonable. *Id.*

In reviewing petitioner's commitment, the Wisconsin Supreme Court identified both *Hendricks* and *Crane* as controlling precedent and reasonably summarized the holdings of both cases. *See Laxton*, 647 N.W.2d at 790-91. The court emphasized that, under *Crane*, "there must be proof of serious difficulty in controlling behavior" which is "sufficient to distinguish the dangerous sexual offender . . . from the dangerous but typical recidivist." *Id.* at 791 (quoting *Crane*, 534 U.S. at 413). Therefore, we conclude that the Wisconsin Supreme Court's adjudication was not "contrary to" Supreme Court precedent. *See Williams*, 529 U.S. at 406 ("[A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."). Because the court identified the correct legal rule, we turn to the "unreasonable application" prong and consider whether it applied *Hendricks* and *Crane* unreasonably to petitioner's case. *See id.* at 407-08.

The Wisconsin Supreme Court affirmed Laxton's commitment, holding that the Wisconsin statute and the commitment trial comported with the requirements articulated in *Hendricks* and *Crane*. The court concluded that civil commitment under the statute does not require "a separate factual finding regarding the individual's serious difficulty in controlling behavior" because this finding is implicit in

the statute's definition of a "sexually dangerous person." *See Laxton*, 647 N.W.2d at 793. The Wisconsin Supreme Court emphasized that the statute requires that the individual is "dangerous *because* he or she suffers from a *mental disorder* that *makes it substantially probable that the person will engage in acts of sexual violence.*" *Id.* (quoting Wis. Stat. § 980.01(7)) (emphasis in Wisconsin Supreme Court decision). Therefore, the court reasoned, "[t]he requisite proof of lack of control is established when the nexus between such person's mental disorder and dangerousness has been established." *Id.* at 787. By concluding that Laxton has a mental disorder and that his mental disorder creates a substantial probability that he will engage in acts of sexual violence, the court explained, the jury had to conclude that Laxton's mental disorder involved serious difficulty for him in controlling his behavior. *Id.* at 795. The court further held that the nexus between the mental disorder and level of dangerousness was "sufficient to distinguish Laxton from a dangerous but typical recidivist" and that the jury instructions at Laxton's trial, which tracked the key statutory language, were proper and did not violate substantive due process. *Id.*

We cannot say that the Wisconsin Supreme Court's adjudication of petitioner's due process claim was an objectively unreasonable application of Supreme Court precedent. In *Hendricks*, the Court emphasized the link between the required finding of future dangerousness and the offender's mental illness or abnormality which makes control over his behavior "difficult if not impossible." *Hendricks*, 521 U.S. at 358. In the particular case before it, the offender had conceded that, when he becomes "stressed out, he cannot control the urge to molest children." *Id.* at 360. The Court concluded: "This admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclu-

sively through criminal proceedings." *Id.* Because the lack of volitional control was undisputed in *Hendricks*, the Court did not address whether a specific jury instruction or finding on this issue was required.

In *Crane*, the Court did require proof of "serious difficulty in controlling behavior," however, it did compel the trial court to give a specific instruction regarding the offender's lack of control. As discussed above, the Kansas Supreme Court had read *Hendricks* to require a specific lack-of-control finding and had reversed the commitment of a sexual offender because the jury did not make such a finding. *See Crane*, 7 P.3d at 290. The Supreme Court vacated the judgment of the Kansas Supreme Court, suggesting that it did not find that the absence of a specific jury instruction and finding on control violated due process. Moreover, the Court acknowledged that it was articulating a less-than-precise constitutional standard. *See Crane*, 534 U.S. at 413 ("the Constitution's safeguards of human liberty in the area of mental illness and the law are not always best enforced through precise bright-line rules"). Because of the lack of clear lines in the field of psychiatry, and its imperfect fit with legal standards, the Court reasoned, it has "sought to provide guidance in this area by proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require." *Id.* This approach, the Court explained, was embodied in *Hendricks*. *Id.*

In light of the Supreme Court's decision in *Crane* to vacate the judgment of the Kansas Supreme Court, the absence of more precise language concerning a lack-of-control element, and the Court's own acknowledgment that bright-line rules are inappropriate in this context, we cannot agree with petitioner's contention that *Crane* clearly establishes that the jury must be instructed and specifically find that petitioner has serious difficulty in controlling his

behavior. It was not objectively unreasonable for the Wisconsin Supreme Court to conclude that the finding of serious difficulty in controlling behavior was implicit in the jury's conclusion that Laxton met the statutory definition of a sexually violent person.

Laxton also contends that the Wisconsin Supreme Court decision is contrary to clearly established federal law because it ignores the requirement that reviewing courts "approach the instructions in the same way that the jury would—with a commonsense understanding of the instructions in light of all that has taken place at the trial." *Johnson v. Texas*, 509 U.S. 350, 368 (1993). Petitioner asserts that the Wisconsin Supreme Court decision is contrary to *Johnson* because the instructions did not adequately inform the jury that there must be proof of serious difficulty in controlling his behavior.

We find no merit in petitioner's argument. While Laxton disputed that he lacked control over his sexually dangerous behavior, the evidence presented at the commitment trial firmly established the requisite nexus between Laxton's mental disorder and his dangerousness. Both Dr. McGuire and Dr. Fields testified that Laxton's mental disorder rendered him unable to control his sexual urges. Even Laxton's own expert acknowledged that his prior sexually violent acts could be a compelling predictor of future violent sexual offenses. The trial court instructed the jury that, in order to find that Laxton was a sexually violent person, it must find that he is "dangerous to others" because he has "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes [him] to engage in acts of sexual violence" and "creates a substantial probability that he will engage in acts of sexual violence." The jury was further instructed that "acts of sexual violence" does not include mere window peeping or exposing oneself. We must presume that the jury followed all the instructions it was given. *United States v. Eberhart*, 388 F.3d 1043, 1050 (7th

Cir. 2004). Therefore, we conclude that, in finding that Laxton was a sexually violent person under this standard, there was "no reasonable likelihood" that the jury did not implicitly conclude that Laxton's mental disorder caused serious difficulty in controlling his sexually violent behavior. *See Johnson*, 509 U.S. at 368 (concluding that "there is no reasonable likelihood that the jury would have found itself foreclosed from considering the relevant aspects of petitioner's youth" where jury was instructed that it could consider all mitigating evidence that had been presented). The Wisconsin Supreme Court's decision to uphold Laxton's commitment in light of these jury instructions was not "diametrically different" or "opposite in character or nature" from any clearly established federal law.

## III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court denying the petition for a writ of habeas corpus.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*