No. 08-4197-pr
*Richard S. v. Carpinello*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2008

(Argued: July 9, 2009                    Decided: December 15, 2009)

Docket No. 08-4197-pr

————————

RICHARD S.,

*Petitioner-Appellant,*

—v.—

SHARON CARPINELLO, RN, PHD, COMMISSIONER,
NEW YORK STATE OFFICE OF MENTAL HEALTH,
JAMES SPOONER, EXECUTIVE DIRECTOR,
ST. LAWRENCE PSYCHIATRIC CENTER,

*Respondents-Appellees,*

————————

B e f o r e :

CALABRESI, HALL, *Circuit Judges*, SESSIONS,[*] *District Judge*

————————

_____

[*] The Honorable William K. Sessions III, Chief Judge, United States District Court for the District of Vermont, sitting by designation.

1

Petitioner-Appellant Richard S. is currently involuntarily confined in a New York state psychiatric facility as a person found not responsible by reason of mental disease or defect for a crime committed in 1980. Richard S. sought habeas corpus relief pursuant to 28 U.S.C. § 2254 on the ground that the New York courts unreasonably failed to apply the United States Supreme Court's holding in *Kansas v. Crane*, 534 U.S. 407 (2002), to his case. The panel holds that *Kansas v. Crane* applies to insanity acquittees, but that the New York courts did not unreasonably conclude that Richard S.'s continued involuntary confinement meets the requirements of the due process clause.

_____

ARTHUR A. BAER, DENNIS B. FELD, Mental Hygiene Legal Service, Mineola, New York, *for Petitioner-Appellant.*

ANDREW M. CUOMO, Attorney General of the State of New York (Alyson J. Gill and Elaine L. Block, Assistant Attorneys General, *on the brief*), New York, New York, *for Respondents-Appellees.*

_____

SESSIONS, *District Judge*:

Petitioner-Appellant Richard S. appeals the July 22, 2008 denial of his petition for habeas corpus by the United States District Court for the Northern District of New York (Hurd, *J.).*

Richard S. argues that the state courts unreasonably refused to apply the United States Supreme Court holding in *Kansas v. Crane*, 534 U.S. 407 (2002), to his case. For the reasons that follow, we hold that *Crane*'s involuntary commitment standard applies to insanity acquittees, but that the New York courts did not unreasonably conclude that Richard S.'s continued involuntary confinement meets the requirements of the due process clause. The denial of Richard S.'s petition for a writ of habeas corpus is therefore affirmed.

**BACKGROUND**

I.      New York's Statutory Scheme

Under New York law, a person charged with a crime may be determined, by the

2

acceptance of a plea or by verdict, to be not responsible by reason of mental disease or defect ("NRRMDD"). *Francis S. v. Stone*, 221 F.3d 100, 101 (2d Cir. 2000). Upon entry of a verdict of NRRMDD or acceptance of a plea of NRRMDD, the court orders a psychiatric examination and conducts an initial hearing to determine whether the acquittee is mentally ill[1] or is suffering from a dangerous mental disorder.[2] N.Y. Crim. Proc. Law § 330.20(2), (5), (6) (McKinney 2005) (hereafter "CPL"). Based on the evidence at the initial hearing the NRRMDD acquittee receives one of three classifications. If the court finds that the NRRMDD acquittee has a dangerous mental disorder, it classifies the acquittee as "Track 1," and must order commitment to a secure facility for an initial term of six months. *See* CPL § 330.20 (1)(f), (6). If the court finds that the NRRMDD acquittee is mentally ill but does not have a dangerous mental disorder, it classifies the acquittee as "Track 2," and must issue an order of conditions[3] and an order

---

[1] According to the statute, "mentally ill" means that a person "currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to [his] welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment." N.Y. Crim. Proc. Law § 330.20(1)(d) (McKinney 2005).

[2] According to the statute, "dangerous mental disorder" means that a person "[(i)] currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others." CPL § 330.20(1)(c). Section 1.03(20) of New York's mental hygiene law defines "mental illness" as "an affliction with a mental disease or mental condition which is manifested by a disorder or disturbance in behavior, feeling, thinking, or judgment to such an extent that the person afflicted requires care, treatment and rehabilitation." N.Y. Mental Hygiene Law § 1.03(20) (McKinney 2009).

[3] The statute defines "order of conditions" as "an order directing [the NRRMDD acquittee] to comply with this prescribed treatment plan, or any other condition which the court determines to be reasonably necessary or appropriate, and, in addition, where [the NRRMDD acquittee] is in custody of the commissioner, not to leave the facility without authorization."

3

committing the acquittee to the custody of the state commissioner of mental health, pursuant to New York's mental hygiene law. CPL § 330.20(7). If the court finds that the NRRMDD acquittee does not have a dangerous mental disorder and is not mentally ill, it classifies the acquittee as "Track 3," and "must discharge the [individual] either unconditionally or subject to an order of conditions." *Id.*; *see also In re David B.*, 766 N.E.2d 565, 570-71 (N.Y. 2002) (describing New York's statutory scheme for involuntary commitment of insanity acquittees).

At the expiration of a six-month commitment order to a secure facility, the NRRMDD acquittee receives the first of a series of court reviews to determine his then current mental condition. If the court finds that the individual continues to have a dangerous mental disorder he must be recommitted under a first retention order for not more than one year. CPL § 330.20(1)(g), (8). Second and subsequent reviews occur every two years. CPL § 330.20(1)(h), (9). If upon review a court finds that the NRRMDD acquittee no longer suffers from a dangerous mental disorder, it may direct transfer to a non-secure facility with an order of conditions if the individual is still mentally ill, or release with an order of conditions if the individual is no longer mentally ill. CPL § 330.20(11), (12). At any time during the period covered by an order of conditions, a court must conduct a hearing and issue an order of recommitment if it finds that the NRRMDD acquittee has a dangerous mental disorder. CPL § 330.20(14).

The NRRMDD acquittee may appeal by permission a commitment order, retention order or recommitment order to an intermediate state appellate court, and may appeal by permission a final decision to the Court of Appeals. CPL § 330.20(21).

---

CPL § 330.20(1)(o).

4

II.    Petitioner's History

From an early age, Richard S. was the victim of repeated severe physical, sexual and emotional abuse by his mother and his older brother. Between the ages of ten and eighteen he attempted suicide four times. At age 17, after his mother's death, he began to abuse alcohol and drugs. Later, after marriage, fatherhood and divorce, he began engaging in promiscuous and risky homosexual encounters.

In July 1980 Richard S. met a fifteen-year-old male, took him home and after a night of sexual relations, stabbed him three times in the chest with a pocket knife while the youth was sleeping. Richard S. turned himself in and was charged with several crimes, including attempted murder in the second degree. At the time of his arrest, he was on probation for manslaughter for the 1978 killing of another man whom he had stabbed to death after sex. He had no memory of engaging in any violence in the earlier case. His probation was revoked and he was incarcerated pending a competency hearing. He again attempted suicide.

Richard S. was found competent to stand trial. He then underwent psychiatric examination to determine his mental state at the time of the crime. All examining psychiatrists agreed that at the time of the stabbing, Richard S. lacked the capacity to appreciate the nature and consequences of his actions, and that he was in need of institutional treatment because of the danger he presented to himself and others. *In re David B.*, 766 N.E.2d at 569. Richard S. was adjudicated not guilty by reason of mental disease or defect, and committed to the custody of the Commissioner of Mental Health, pursuant to CPL § 330.20. *Id.* Based on the New York Supreme Court's findings, Richard S. was classified as "Track 1," and committed to a secure

facility in 1981.  At the time of his initial commitment, Richard S. received a diagnosis of atypical psychosis, psychosexual disorder and substance abuse disorder.  *Id.*

After a series of retention orders, the state Supreme Court in 1994 ordered Richard S. transferred to a non-secure facility because, although he remained mentally ill, he was no longer dangerously mentally ill.  In 1996, based on allegations whose truth and significance is disputed, the state court ordered Richard S. returned to a secure facility under an emergency transfer order.

In 1998, the state Supreme Court again concluded that Richard S. no longer suffered from a dangerous mental disorder, but still qualified as mentally ill, and should be placed in a non-secure facility.  *See id*. at 570.  On appeal from the Appellate Division's affirmance of the hearing court's decision, the New York Court of Appeals first confirmed

> that there is a constitutionally required minimum level of dangerousness to oneself or others that must be shown before an insanity acquittee may be retained in a non-secure facility, and that a finding that an individual is 'mentally ill' as defined under CPL 330.20(1)(d) contemplates a degree of dangerousness that satisfies due process concerns.

*Id.*  That minimum level of dangerousness "may be supported by evidence of violence," *id.* at 572, but

> [a]part from evidence of violence, retention of an insanity acquittee in a non-secure facility is justified where the State shows by a preponderance of the evidence that continued care and treatment are essential to the physical or psychological welfare of the individual and that the individual is unable to understand the need for such care and treatment.  Retention also may be supported by the need to prepare for a safe and stable transition from non-secure commitment to release.  Thus, in addition to recent acts of violence and the risk of harm to the defendant or others that would be occasioned by release from confinement, a court may consider the nature of the conduct that resulted in the initial commitment, the likelihood of relapse or a cure, history of substance or alcohol abuse, the effects of medication, the likelihood that the patient will discontinue medication without supervision, the length of confinement and

6

treatment, the lapse of time since the underlying criminal acts and any other relevant factors that form a part of an insanity acquittee's psychological profile.

*Id.* On remand, in 2003 the state Supreme Court applied the *David B.* standard, and found that Richard S. was mentally ill and dangerous and required confinement in a non-secure facility.[4] *See In re Richard S.*, 776 N.Y.S.2d 604, 605 (N.Y. App. Div. 2004). The Appellate Division affirmed, concluding that Richard S. "meets all the criteria for retention in a nonsecure facility." *Id.* at 607. It found that the lower court's findings of mental illness and dangerousness were supported by a "strong preponderance of the credible evidence," and that the lower court implicitly concluded that Richard S. "is not cured, treatment is essential for his psychological welfare and the safety of others, and he is unable to comprehend the need for such treatment." *Id.* It rejected as "without merit" Richard S.'s contention that his continued confinement is improper absent a showing of "volitional impairment" or difficulty controlling his behavior. *Id.* The New York Court of Appeals dismissed Richard S.'s appeal of that decision. *In re Richard S.*, 818 N.E.2d 668 (N.Y. 2004) (table decision).

Richard S. filed a habeas corpus petition in the United States District Court for the Northern District of New York on December 6, 2004, challenging the state courts' failure to apply the United States Supreme Court's holding in *Kansas v. Crane* to his case. In addition he argued that he had established by clear and convincing evidence that he does not have serious difficulty in controlling his behavior. On March 17, 2008 the United States Magistrate Judge issued a Report and Recommendation recommending that the petition be denied and a certificate

---

[4] Between 1998 and 2003 the Commissioner of Mental Health had sought two more subsequent retention orders, in October 2000 and October 2002. These proceedings were consolidated with the remand proceeding.

of appealability issue. The district court adopted the Report and Recommendation, and issued a certificate of appealability on October 24, 2008. *See Richard S. v. Carpinello*, 628 F. Supp. 2d 286, 287 (N.D.N.Y. 2008) (order adopting report and recommendation); *Richard S. v. Carpinello*, No. 9:04cv1403 (N.D.N.Y. Oct. 24, 2008) (order granting certificate of appealability). The court found no merit in Richard S.'s argument that in order to confine an insanity acquittee, *Crane* requires the state to prove not only that he is mentally ill and dangerous, but also that he has serious difficulty controlling his behavior. Because the district court concluded that the state was not required to prove that Richard S. has serious difficulty controlling his behavior, it did not address his second argument in any detail, noting only that Richard S. had not rebutted by clear and convincing evidence the presumption that the state court's factual determination was correct.

## DISCUSSION

I.     Standard of Review

We review de novo a district court's decision to deny a petition for writ of habeas corpus. *E.g.*, *Henry v. Ricks*, 578 F.3d 134, 137 (2d Cir. 2009). When a state court has adjudicated the merits of a petitioner's claim, a federal court may grant an application for a writ of habeas corpus only if "the adjudication of the claim--(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also, e.g.*, *Brown v. Alexander*, 543 F.3d 94, 100 (2d Cir. 2008). Under

8

§2254(d)(1), a state-court decision is contrary to clearly established Supreme Court precedent if its "conclusion on a question of law is 'opposite' to that of the Supreme Court or if the state court decides a case differently than the Supreme Court's decision 'on a set of materially indistinguishable facts.'" *Id.* (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). Richard S. concedes that the state courts' decision was not contrary to clearly established federal law, but argues that it involved an unreasonable refusal to extend or apply clearly established federal law as determined by the Supreme Court in *Crane*.

A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case. *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000); *accord Kennaugh v. Miller*, 289 F.3d 36, 45 (2d Cir. 2002); *see also Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004) ("Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") "[B]ear[ing] in mind that 'unreasonable' is not synonymous with 'incorrect,'" *Serrano v. Fischer*, 412 F.3d 292, 297 (2d Cir. 2005), the "unreasonable application" standard requires "[s]ome increment of incorrectness beyond error . . . . [although] the increment need not be great." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000).

Under § 2254(d)(2), a state court's determination of a factual issue is presumed to be correct, and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also, e.g., Brown*, 543 F.3d at 100.

9

II.     Due Process Claim

The United States Supreme Court has long held that the Due Process Clause allows an insanity acquittee to be confined "as long as he is both mentally ill and dangerous, but no longer." *Foucha v. Louisiana*, 504 U.S. 71, 77 (1992); *accord Jones v. United States*, 463 U.S. 354, 368 (1983) ( "The committed acquittee is entitled to release when he has recovered his sanity or is no longer dangerous.").  Although insanity acquittees may be initially committed based on a preponderance of the evidence rather than by clear and convincing evidence, *see Jones*, 463 U.S. at 367-68, with respect to the requirement that a state demonstrate both mental illness and dangerousness, the Supreme Court does not distinguish between civil commitment candidates and insanity acquittees.  *See id.* at 368 (citing *O'Connor v. Donaldson*, 422 U.S. 563, 575-76 (1975), a civil commitment case, in support of its holding that an insanity acquittee is entitled to release when he has recovered his sanity or is no longer dangerous).

In 1997 and 2002, the Supreme Court considered the constitutionality of civil commitment of dangerous sexual offenders under the Kansas Sexually Violent Predator Act, in *Kansas v. Hendricks*, 521 U.S. 346 (1997), and *Kansas v. Crane*, 534 U.S. 407 (2002).  The Kansas act established procedures for the civil commitment of  sexually violent predators, defined as  persons who have "been convicted of or charged with a sexually violent offense and who suffer[] from a mental abnormality or personality disorder which makes [them] likely to engage in the [sic] predatory acts of sexual violence."  Kan. Stat. Ann. § 59-29a02(a) (1994); *see Hendricks*, 521 U.S. at 352.

In *Hendricks*, the Court noted that it had consistently upheld state involuntary

10

commitment statutes "when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.'" 521 U.S. at 358. It reasoned that the statutory requirement of the existence of certain mental conditions that make one likely to engage in acts of sexual violence "serve[s] to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* It concluded that the Kansas act "requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." *Id.* The statutory requirement of a "mental abnormality" or "personality disorder" rendered the Kansas act consistent with the requirements of other statutes upheld by the Supreme Court "in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." *Id.*

*Hendricks* thus did not limit the availability of involuntary commitment to those suffering from mental illness. If the individual has a mental abnormality or a personality disorder that renders him unable to control his dangerousness, thus linking his mental condition to a determination of future dangerousness, he may constitutionally be confined until his condition no longer causes him to be a threat to others. *Id.* at 363-64.

In *Crane*, the Supreme Court addressed the degree of inability to control one's dangerousness that will satisfy substantive due process. The Court rejected the argument that a state must demonstrate complete lack of control, and it rejected the argument that a state need not make "*any* lack-of-control determination." *Crane*, 534 U.S. at 412. Acknowledging that

11

inability to control one's behavior is an imprecise concept, the Court deferred to the science of psychiatry and the will of the legislature to define the mental conditions that allow the state to seek involuntary commitment. *Id.* at 413. It held only that "in cases where lack of control is at issue, . . . there must be proof of serious difficulty in controlling behavior." *Id.* Because the state high court had held that civil commitment under the Kansas act required a separate finding that an individual is unable to control his behavior, the United States Supreme Court vacated the judgment and remanded for further proceedings. *Id.* at 415.

A.      Application of *Kansas v. Crane* to Insanity Acquittees

We address first the state's contention that *Kansas v. Crane* does not govern due process standards for insanity acquittees. Although *Crane* and its predecessor *Hendricks* specifically addressed the involuntary commitment of two convicted sex offenders nearing the end of their prison sentences, the Kansas act applies not only to convicted sex offenders, but also to those who have been found incompetent to stand trial or not guilty because of a mental disease or defect. *See Hendricks*, 521 U.S. at 352 (describing the structure of the Kansas act's civil commitment procedures).

The Supreme Court began its analysis of the constitutionality of the Kansas act by citing *Foucha*, an insanity acquittee case, for the general principle that an individual's due process right to freedom from physical restraint may be overridden by a state's provision for civil commitment of those "who are unable to control their behavior and who thereby pose a danger to the public health and safety." *Id.* at 357. The Court noted that it had "consistently upheld *such* involuntary commitment statutes provided the confinement takes place pursuant to proper procedures and

12

evidentiary standards." *Id.* (emphasis added). It endorsed generally the ability of state legislatures to define mental health terms that will have legal significance, *see id.* at 359, as long as the statutes "limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control." *Id.* at 358.

In *Crane*, the Supreme Court explained that this "lack of control" meant "proof of serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413. Again it cited to *Foucha* as it distinguished civil commitment of the dangerous individual with a serious mental illness, abnormality or disorder from the "dangerous but typical recidivist convicted in an ordinary criminal case." *Id.* It summarized its approach to establishing constitutional safeguards in the general area of mental illness as "proceeding deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require." *Id.* at 414.

*Crane* elaborated on the general constitutional standard for civil commitment in the context of the Kansas act, which provided for civil commitment of those convicted of or charged with sexually violent acts. The Supreme Court did not change the standard for involuntary commitment. *See Varner v. Monahan*, 460 F.3d 861, 864 (7th Cir. 2006) (commenting that *Crane* did not disturb the Supreme Court's holding that persons with mental defects and dangerous proclivities may constitutionally be civilly committed). Nor did the Supreme Court's decision in *Crane* create a constitutional distinction between sentenced offenders and insanity acquittees. In essence, *Crane* and *Hendricks* rephrased the general constitutional standard for civil commitment of insanity acquittees and other candidates for civil commitment to clarify that proof of mental illness embraces proof of a mental condition that makes it difficult to control

13

one's dangerous behavior. *Hendricks*, 521 U.S. at 358; *Crane*, 534 U.S. at 413. There is no justification for the contention that the Supreme Court meant this standard to apply only to convicted sex offenders, given the broad coverage of the Kansas act and the broad context of the Court's discussion. The district court thus erred when it concluded that *Crane* does not apply to insanity acquittees. *See Richard S.*, 628 F. Supp. 2d at 293.

B.      Requirement of a Separate Finding of Inability to Control Behavior

Next we address Richard S.'s contention that *Crane* refined the constitutional standard for his continued involuntary commitment by requiring the state to prove that he has serious difficulty in controlling his dangerous behavior. The district court viewed *Crane* as having mandated an additional due process requirement for involuntary confinement pursuant to sexually violent predator statutes, specifically that a state must also prove that the alleged predator has serious difficulty in controlling behavior. *Id.* This too was error. By far the majority of state high courts and circuit courts of appeal that have examined the *Crane* decision have concluded that the Supreme Court did not add a factor to the due process test for involuntary commitment. *See Varner*, 460 F.3d at 864 ("Once a jury has found mental illness and a likelihood of future offenses, it has drawn the line [between civil commitment and the criminal law] the Court thought essential."); *Laxton v. Bartow*, 421 F.3d 565, 572 (7th Cir. 2005) (holding that *Crane* did not "clearly establish[] that the jury must be instructed and specifically find that petitioner has serious difficulty in controlling his behavior"); *In re Leon G.*, 59 P.3d 779, 786 (Ariz. 2002) (holding that *Crane* did not alter the *Hendricks* analysis "that focused on the *link* between proof of dangerousness and proof of mental abnormality"); *People v. Williams*,

14

74 P.3d 779, 790 (Cal. 2003) ("[*Crane*] does not compel us to hold that further lack-of-control instructions or findings are necessary to support a commitment under [California's Sexually Violent Predators Act]."); *State v. White*, 891 So. 2d 502, 509-510 (Fla. 2004) ("While *Crane* requires proof of serious difficulty in controlling behavior, the proof *Crane* requires is not proof *in addition to* that already required under [Florida's sexually violent predator] statute.") (internal quotation marks omitted); *In re Detention of Varner*, 800 N.E.2d 794, 798 (Ill. 2003) (holding that *Crane* does not require a specific determination by the fact finder that a person lacks volitional control); *In re Dutil*, 768 N.E.2d 1055, 1064 (Mass. 2002) ("As long as the [Massachusetts] statute requires a showing that the prohibited behavior is the result of a mental condition that causes a serious difficulty in controlling behavior, the statute meets due process requirements."); *In re Vantreece*, 771 N.W.2d 585, 587-88 (N.D. 2009) (holding that the due process requirement of serious difficulty in controlling behavior is part of the definition of sexually dangerous individual, which requires a nexus between the mental disorder and the dangerousness); *In re Treatment & Care of Luckabaugh*, 568 S.E.2d 338, 348 (S.C. 2002) ("*Crane* does not mandate a court must separately and specially make a lack of control determination, only that a court must determine the individual lacks control while looking at the totality of the evidence."); *In re Detention of Thorell*, 72 P.3d 708, 715-16 (Wash. 2003) (en banc) ("*Crane* requires a determination that a potential SVP has serious difficulty controlling dangerous, sexually predatory behavior, but does not require a *separate* finding to that effect."); *In re Commitment of Laxton*, 647 N.W.2d 784, 787 (Wis. 2002) ("[A] civil commitment does not require a separate finding that the individual's mental disorder involves serious difficulty for

15

such person to control his or her behavior."). *But see In re Detention of Barnes*, 658 N.W.2d 98, 101 (Iowa 2003) (holding that to justify civil commitment, the jury must be instructed that the person's mental condition must cause serious difficulty in controlling behavior); *In re Thomas*, 74 S.W.3d 789, 792 (Mo. 2002) (en banc) (requiring a jury instruction defining mental abnormality to include serious difficulty in controlling behavior); *In re Commitment of W.Z.*, 801 A.2d 205, 219 (N.J. 2002) (holding that for involuntary commitment under the state's sexually violent predators act, the state must prove an additional requirement "that the individual has serious difficulty controlling his or her harmful sexual behavior such that it is highly likely that the person will not control his or her sexually violent behavior and will reoffend").

We agree with the majority of courts that have addressed this issue. The Supreme Court neither strayed from nor expanded its core holding: for involuntary commitment to withstand due process scrutiny, a state must prove mental illness and dangerousness. *Foucha*, 504 U.S. at 75-76. *Hendricks* and *Crane* provided an explanation of the mental illness portion of the test: the state may satisfy this component by proving that an individual has a mental condition, abnormality or disorder that is sufficiently severe that he has serious difficulty in controlling his dangerous behavior. *See Crane*, 534 U.S. at 413.

To the extent then that Richard S. argues that *Crane* requires a specific finding with respect to lack-of-control, we do not find support for his position in the Supreme Court's decision. Moreover, to the extent that other courts may have determined that *Crane* added to or changed the state's proof in involuntary commitment cases, the law is not "clearly established," as determined by the Supreme Court, and will not afford Richard S. habeas relief. *See Laxton*,

16

421 F.3d at 572 (holding that, given the Supreme Court's acknowledgment that bright-line rules concerning a lack-of-control element are inappropriate, *Crane* did not clearly establish a separate finding requirement).

Richard S. also argues that the state failed to demonstrate that he currently has a mental condition that makes it difficult to control his dangerousness. He contends that future dangerousness cannot continue to be presumed based on his original adjudication of not guilty by reason of mental disease or defect, a point with which we do not disagree. The state, however, has sought periodic review of Richard S.'s retention, as required by statute. *See* CPL § 330.20(8), (9). Most recently, in support of retention the state presented evidence that Richard S. "has a very complex psychiatric condition and currently meets the criteria for four intertwined disorders: sexual sadism, gender identity disorder, antisocial personality disorder and borderline personality disorder." *In re Richard S.*, 776 N.Y.S.2d at 605. According to one of his treating psychiatrists, Richard S.'s sexual sadism, deemed his most dangerous condition, "is a chronic condition which usually worsens over time and is difficult or perhaps impossible to fully treat." *Id.* at 605-06. The psychiatrist also indicated that Richard S. "has refused the use of objective measures to evaluate his condition, is not open to treatment for it and denies that he is a sexual sadist." *Id.* at 606. Another psychiatrist agreed that there had been no progress in treatment because Richard S. denied that he was a sexual sadist. *Id.* Richard S.'s diagnoses have also included poly-substance abuse in institutional remission. The psychiatrists expressed concern that Richard S. has never participated in a substance abuse treatment program, and that substance abuse may be associated with triggering sadistic impulses, even if consciously

17

suppressed or controlled. *Id.*

Richard S. offered contrary expert evidence as to his mental condition, *id.* at 606-07, but the Appellate Division concluded: "Taking into account all the expert opinions in the record, . . . County Court's findings of a mental illness and dangerousness are supported by a strong preponderance of the credible evidence," and therefore Richard S. was appropriately retained in a nonsecure facility. *Id.* at 607.

The state courts made no explicit finding that Richard S. currently lacked an ability to control his dangerous behavior. *See id.* A fair reading of *Crane*, however, requires no explicit finding, as long as the evidence presented proves "serious difficulty in controlling behavior." *Crane*, 534 U.S. at 413. Proof of a mental disorder or abnormality that makes it seriously difficult to control one's dangerous behavior will satisfy the mental illness factor for involuntary commitment. *Id.*; *accord Hendricks*, 521 U.S. at 358.

The state courts found that Richard S. continues to suffer from a complex and serious mental disorder for which he refuses to receive treatment because he denies that he suffers from the disorder. From these facts the state court concluded that Richard S. is unable to understand his need for treatment, *see In re Richard S.*, 776 N.Y.S.2d at 607; *see also* CPL § 330.20(1)(d) ("'Mentally ill' means that a defendant currently suffers from a mental illness for which care and treatment . . . is essential to such defendant's welfare and that his judgment is so impaired that he is unable to understand the need for such care and treatment. . . ."). Richard S. does not here dispute that he currently suffers from mental illness as that term is defined in CPL § 330.20(1)(d), nor that his dangerousness stems from his mental illness. The hearing

18

testimony further established that without treatment Richard S. may be unable or unwilling to recognize or to avoid the circumstances that prompt him to engage in dangerous and potentially homicidal behavior. The state courts therefore found the link that *Hendricks* and *Crane* require, between an individual's mental condition and a lack of ability to control one's dangerousness. Their decision that Richard S. remained mentally ill and dangerous because of that inability to control was not an unreasonable application of clearly established federal law.

C.      Serious Difficulty in Controlling Behavior

Richard S.'s remaining argument, that the evidence failed to establish a *serious* difficulty in controlling behavior, *see Crane*, 534 U.S. at 413, asks us to find that the state courts' decision was based on an unreasonable determination of the facts in light of the evidence presented. He dismisses as irrelevant the evidence concerning his lack of insight into his illness, his history of drug and alcohol abuse and refusal to obtain treatment, and his violation of facility rules. He stresses evidence that he has demonstrated an ability to control any dangerous impulses over more than twenty years of confinement. Assuming that this evidence carries some, perhaps even substantial, weight in determining whether Richard S. has a mental condition that makes it seriously difficult for him to control his dangerous behavior, it fails to rebut by clear and convincing evidence the state courts' findings. *See, e.g.*, *Majid v. Portuondo*, 428 F.3d 112, 125 (2d Cir. 2005) ("In habeas proceedings, 'a determination of a factual issue made by a State court shall be presumed to be correct' and the petitioner 'shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" (quoting § 2254(e)(1)).

The Supreme Court recognized that *Hendricks* as explained by *Crane* did not provide a

19

precise constitutional standard for evaluating an inability to control one's dangerous behavior. *See Crane*, 534 U.S. at 413. The Court preferred instead to "proceed[] deliberately and contextually, elaborating generally stated constitutional standards and objectives as specific circumstances require." *Id.* at 414. A state court that has made the constitutionally requisite determination of mental illness linked to dangerousness has not unreasonably applied clearly established federal law, nor has it made an unreasonable determination of the facts. Even if we would require more or different proof of serious difficulty in controlling behavior, relief is not available under § 2254. *See, e.g.*, *Varner*, 460 F.3d at 864 ("Where . . . a person's difficulty in controlling his behavior must fall remains open to decision one case at a time, and this implies the absence of a 'clearly established' rule that the state judiciary could transgress.").

Accordingly, although the district court erred in concluding that *Kansas v. Crane* did not apply to insanity acquittees, the state courts did not unreasonably apply clearly established federal law with respect to the involuntary commitment of Richard S., nor did they unreasonably determine the facts with respect to his mental illness and its link to his dangerousness.

**CONCLUSION**

The denial of petitioner's application for a writ of habeas corpus is affirmed.