IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,184

In the Matter of the Care and Treatment
of RICHARD A. QUILLEN.

SYLLABUS BY THE COURT

1.

Substantive due process requires the State to present proof that a respondent has a mental abnormality or personality disorder that causes serious difficulty in controlling behavior in order to involuntarily civilly commit him or her under the Kansas Sexually Violent Predator Act (KSVPA), K.S.A. 2019 Supp. 59-29a01 et seq.

2.

The State's continued involuntary commitment of a sexually violent predator under the KSVPA does not violate substantive due process as long as the sexually violent predator remains both mentally ill and dangerous.

3.

Once a respondent committed under the KSVPA has demonstrated probable cause to believe that he or she is no longer mentally ill and/or dangerous, due process requires the State prove the respondent continues to suffer a mental abnormality that makes it difficult to control one's dangerous behavior, and that he or she remains dangerous.

1

4.

At a transitional release hearing, substantive due process is satisfied when the jury instructions, taken as a whole, require the jury to necessarily and implicitly find the respondent continues to have serious difficulty in controlling behavior and remains dangerous.

Review of the judgment of the Court of Appeals in 57 Kan. App. 2d 407, 451 P.3d 478 (2019). Appeal from Johnson District Court; KEVIN P. MORIARTY, judge. Opinion filed March 5, 2021. Judgment of the Court of Appeals vacating and remanding to the district court is affirmed in part and reversed in part. Judgment of the district court is affirmed.

*Michael J. Bartee*, of Michael J. Bartee, P.A., of Olathe, argued the cause and was on the brief for appellant.

*Dwight R. Carswell*, assistant solicitor general, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.: Richard A. Quillen was civilly committed as a sexually violent predator under the Kansas Sexually Violent Predator Act (KSVPA) in 2006. Several years later, he petitioned to be placed in transitional release over the objection of the Secretary for the Kansas Department of Aging and Disability Services (KDADS). The district court eventually held a jury trial to determine whether Quillen was safe to be placed on transitional release, and the jury found Quillen's mental abnormality or personality disorder remained such that he was not safe to be placed in transitional release, and if transitionally released, he was likely to engage in repeat acts of sexual violence. See K.S.A. 2019 Supp. 59-29a08. Quillen appealed, arguing the district court erred when it denied his request to instruct the jury that it must find Quillen had serious difficulty controlling his behavior and this instructional error violated his substantive due process

rights. The Court of Appeals agreed with Quillen, vacating the verdict and remanding for a new trial.

This appeal requires us to determine the due process standard to be applied at transitional release hearings under the KSVPA and decide whether the district court's jury instructions satisfied this standard. We hold that once a respondent committed under the KSVPA has demonstrated probable cause to believe that he or she is no longer mentally ill and/or dangerous, substantive due process requires the State to show the respondent continues to meet the criteria justifying initial commitment, including proof that the respondent has serious difficulty controlling his or her dangerous behavior, in order to deny transitional release. We also hold that at a transitional release hearing, substantive due process requirements are satisfied when the jury instructions, taken as a whole, require the jury to necessarily and implicitly find the respondent continues to have serious difficulty controlling his or her dangerous behavior. Finally, we conclude that the jury instructions given at Quillen's transitional release hearing were constitutionally adequate under this standard. Therefore, we affirm the Court of Appeals in part, reverse in part, and affirm the judgment of the district court based on the jury verdict.

FACTS AND PROCEDURAL BACKGROUND

*Quillen's Initial Commitment as a Sexually Violent Predator*

In the 1990s, Quillen was convicted of multiple sex crimes involving children. He was set to be released from prison in 2006 after completing the sentence for his most recent conviction. Before his release, the State petitioned to have Quillen civilly committed as a sexually violent predator under the KSVPA. Quillen eventually entered a consent decree stipulating he was a sexually violent predator. The district court acknowledged the consent decree and found Quillen to be a sexually violent predator.

3

The court committed Quillen to the custody of the Secretary of Social and Rehabilitation Services and sent him to the Larned State Security Hospital Sexual Predator Treatment Program (the Program). The custody of all sexually violent predators was later transferred to the Secretary of KDADS. L. 2014, ch. 115, §§ 214-16; see K.S.A. 2014 Supp. 59-29a02; K.S.A. 2014 Supp. 59-29a07; K.S.A. 2014 Supp. 59-29a11.

Like all respondents committed under the KSVPA, Quillen was entitled to an annual review of his current mental condition. K.S.A. 2019 Supp. 59-29a08(a). Ordinarily, if a respondent contests his or her annual report and petitions for transitional release over the Secretary's objection, he or she is entitled to an annual review hearing at which the respondent bears the burden to "show probable cause to believe the person's mental abnormality or personality disorder has significantly changed so that the person is safe to be placed in transitional release." K.S.A. 2019 Supp. 59-29a08(d). However, as part of Quillen's consent decree, the State waived the requirement of a probable cause hearing and agreed to hold a full hearing if Quillen ever petitioned for transitional release. At a hearing for transitional release, the State bears the burden to "prove beyond a reasonable doubt that the person's mental abnormality or personality disorder remains such that the person is not safe to be placed in transitional release and if transitionally released is likely to engage in repeat acts of sexual violence." K.S.A. 2019 Supp. 59-29a08(g).

*Quillen's 2013 Annual Review and Subsequent Proceedings*

In 2013, Quillen contested his annual report and requested a hearing to determine if he should be placed in transitional release over the Secretary's objection. The district court denied his request without setting a hearing, and Quillen appealed. *In re Care and Treatment of Quillen*, No. 114,708, 2016 WL 7324416, at *1 (Kan. App. 2016) (unpublished opinion). After Quillen moved for summary disposition of his appeal, the

4

State suggested the Court of Appeals should construe his motion as a motion for remand. The State also suggested that "'on remand, [Quillen] be given a hearing pursuant to K.S.A. 59-29a08, with all attendant rights, including the right to request a jury, the right to counsel, and the right to an independent examination.'" 2016 WL 7324416, at *1. The Court of Appeals agreed and summarily reversed and remanded to the district court for a hearing.

On remand, the district court appointed counsel for Quillen and authorized Quillen to obtain an independent evaluation from Dr. Robert Barnett. Before the trial for Quillen's 2013 annual review could take place, Quillen petitioned for an annual review hearing on his 2014 annual report. The court consolidated the hearings on the 2013 and 2014 annual reports and set the matter for jury trial in July 2015.

Several weeks before Quillen's jury trial, Senate Bill 12 went into effect, resulting in significant changes to the KSVPA. Specifically, Senate Bill 12 amended K.S.A. 59-29a08, to eliminate a respondent's right to trial by jury. 2016 WL 7324416, at *1-2; see L. 2015, ch. 95, § 8. At a pretrial conference, the State argued Quillen did not have a right to a jury trial on his petition for transitional release under the amended version of K.S.A. 2015 Supp. 59-29a08. The district court agreed. After a bench trial, the court held Quillen's "'mental abnormality and/or personality disorder remains such that he is not safe to be placed in transitional release, and that if [he] was placed in transitional release, he would be likely to engage in acts of sexual violence.'" 2016 WL 7324416, at *2. Accordingly, the court ordered Quillen to remain in the custody of the Secretary of KDADS.

Quillen again appealed. Among other claims of error, he argued the district court erred by applying Senate Bill 12 retroactively to deny his right to trial by jury. The Court

5

of Appeals agreed and remanded Quillen's case to the district court for a jury trial. 2016 WL 7324416, at *1, 6.

Before the second trial could take place, Quillen suffered a stroke. As a result, he had difficulty speaking and was partially paralyzed on his right side, impairing his ability to walk and write. In late 2017, Quillen moved for discharge from the Program under K.S.A. 2017 Supp. 59-29a25 because of the physiological changes caused by his stroke. After a hearing, the district court denied the motion, finding Quillen had failed to carry his burden to prove he had a permanent physiological change that rendered him unable to commit a sexually violent offense.

*Quillen's Transitional Release Hearing*

In April 2018, Quillen's case proceeded to trial. The State presented testimony from several witnesses who had either worked with or evaluated Quillen. Brad Base, owner and president of Sunflower Psychological Services, had conducted Quillen's annual reviews in 2016 and 2017. He diagnosed Quillen as suffering from "pedophilic disorder, attracted to females, nonexclusive type," and "other specified personality disorder with borderline and antisocial features."

Base conducted two assessments to determine Quillen's risk of reoffending. One assessment, known as the Static-99R, considered static factors, such as the sex of an offender's victims, that influence the likelihood that a sex offender will reoffend. The other assessment, known as the Sex Offender Treatment Intervention and Progress Scale (SOTIPS), considered both static and dynamic factors to determine the likelihood that a sex offender will reoffend. Base testified Quillen had an above average risk of reoffending according to the Static-99R and a moderate risk of reoffending according to the SOTIPS.

Base explained that around 2016, the Program switched to a three-tier system. In Tier 1, offenders focus on acquiring skills to cope with the thoughts, emotions, and behaviors that led to their offense, and they develop a relapse prevention program. After completing Tier 1, offenders advance to Tier 2, in which they participate in highly structured, supervised outings. Once offenders have demonstrated adherence to their relapse prevention program while on these outings, they advance to Tier 3. In Tier 3, offenders move into a reintegration facility and spend more time in the community at large while still being closely monitored by staff. Offenders generally spend a year or two in the reintegration facility before they are ready for transitional release.

Base testified that Quillen remained in Tier 1. While Quillen had completed a relapse prevention program and generally complied with basic program requirements, such as attending classes, completing paperwork, and maintaining his hygiene, Base said Quillen also exhibited poor impulse control at times. And because Quillen had not advanced to Tier 2, Base had not observed whether Quillen could adhere to his relapse prevention program while in the community. For these reasons, Base concluded Quillen was not safe to be placed in transitional release.

Dr. Kristopher Adams, Quillen's primary therapist, began working with Quillen in September 2017. He agreed with Quillen's pedophilia and personality disorder diagnoses. He added that Quillen had poor impulse control, difficulty controlling his anger, and needed to work on his frustration tolerance. Dr. Adams had observed Quillen get angry during interactions with others and yell or walk away. He said Quillen was also reluctant to participate in group therapy, even after staff accommodated Quillen's speech impairment after his stroke.

Dr. Mike Dixon, director of the Program, opined that Quillen should remain in secure confinement. He agreed with Quillen's pedophilia and personality disorder diagnoses and believed Quillen's physiological changes would not affect his ability to reoffend. He also opined Quillen needed better control over his anger before he could leave secure confinement.

Dr. Tomas Garza, who supervised Quillen's medical care, testified Quillen was still able to commit sexually violent offenses because strokes rarely affect sexual function. He also said Quillen had displayed anger management problems before his stroke. He believed Quillen's angry and aggressive behavior had temporarily improved after the stroke, but his negative behavior was beginning to reemerge.

Dr. Marc Quillen conducted an evaluation of Quillen to determine the effects of the stroke. He testified none of the effects of Quillen's stroke would change his diagnoses, and the stroke may have exacerbated behaviors contributing to Quillen's personality disorder diagnosis. Dr. Quillen testified that the stroke may also negatively affect Quillen's impulse control due to the affected area in Quillen's brain. He opined that Quillen was at an increased risk for reoffending and was not safe to be placed on transitional release.

Quillen's independent evaluator, Dr. Barnett, testified that Quillen was not currently a pedophile nor did he have a personality disorder of any type. He criticized the assessments used to determine Quillen's risk of reoffending as unreliable. He opined that Quillen's risk of reoffending was "no greater than the base rate in the public," which was about 3% to 6%. Dr. Barnett added that the stroke's effects would also make it more difficult for Quillen to reoffend because his physical impairments and difficulty communicating would impede his ability to groom potential victims. Dr. Barnett also

8

testified that Quillen had a history of controlling his behavior while in the Program, and he believed Quillen would behave "fairly well" if placed in transitional release.

Quillen also testified, though he was mostly limited to answering yes or no questions because of his difficulty speaking. Quillen said he had completed all the curriculum requirements of the Program, had not had any fights or disagreements with treatment providers, and had not acted out sexually while in the Program. He also felt he was ready to move to transitional release.

After the close of evidence, the district court held a jury instruction conference. Among the proposed instructions were jury instruction Nos. 2 and 3:

"JURY INSTRUCTION NO. 2

"In this trial, the State has the burden to prove beyond a reasonable doubt that [Quillen's] mental abnormality or personality disorder remains such that he is not safe to be placed in transitional released [*sic*] and if transitionally released is likely to engage in repeat acts of sexual violence.

"[Quillen] is not required to disprove the State's claim. The test you must use is this:  If you have a reasonable doubt about the truth of any of the required elements that the State must prove, you must find that [Quillen] is safe to be placed in transitional release. If you have no reasonable doubt about the truth of any of the required elements that the State must prove, you should find that [Quillen] is not safe to be placed in transitional release, and should remain in secure commitment."

"JURY INSTRUCTION NO. 3

"[Quillen] is civilly committed to Larned State Security Hospital with the diagnoses of mental abnormalities and personality disorders including Pedophilic

9

Disorder, Attracted to Females, Nonexclusive Type; Other Specified Personality Disorder with Borderline and Antisocial Features.

"The State alleges [Quillen] is not safe to be placed in transitional release. [Quillen] believes he is eligible for transitional release.

"To deny his transitional release, the State must prove the following:

"1. [Quillen's] mental abnormality or personality disorder remains such that he is not safe to be placed in transitional release.

"2. If transitionally released, he is likely to engage in acts of sexual violence."

Quillen objected to these instructions and requested additional language requiring the jury to find his "mental abnormality or personality disorder makes it seriously difficult for him to control his dangerous behavior." He argued the additional language was necessary to comport with due process and to comply with the United States Supreme Court's decision in *Kansas v. Crane*, 534 U.S. 407, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002). The State argued the instructions should be given as proposed, relying on *In re Care and Treatment of Burch*, No. 116,600, 2017 WL 3947430 (Kan. App. 2017) (unpublished opinion). The court rejected Quillen's request and gave jury instruction Nos. 2 and 3 as proposed.

The jury found Quillen was not safe to be placed in transitional release and should remain in secure confinement. Based on the jury's verdict, the district court ordered Quillen to remain committed. Quillen moved for a new trial. Among other claims, he reiterated his objections to the jury instructions. The court denied the motion. Quillen appealed.

*The Court of Appeals Decision*

The Court of Appeals agreed with Quillen's objection to the instructions. *In re Care & Treatment of Quillen*, 57 Kan. App. 2d 407, 451 P.3d 478 (2019). Relying on *Crane* and *Kansas v. Hendricks*, 521 U.S. 346, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), the panel concluded "due process requires the fact-finder—at both the initial commitment proceeding and the annual review proceedings—to conclude beyond a reasonable doubt that the respondent has serious difficulty controlling his or her behavior." *Quillen*, 57 Kan. App. 2d at 417. The panel also found the district court's failure to instruct the jury to make a separate finding on this issue was not harmless. Accordingly, the panel vacated the verdict and remanded for a new trial. 57 Kan. App. 2d at 418-20. We granted the State's petition for review.

ANALYSIS

*Legal Framework and Standard of Review*

This court follows a three-step process when analyzing jury instruction issues:

> "'(1) determining whether the appellate court can or should review the issue, *i.e.*, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal;
> (2) considering the merits of the claim to determine whether error occurred below; and
> (3) assessing whether the error requires reversal, *i.e.*, whether the error can be deemed harmless.'" *State v. McLinn*, 307 Kan. 307, 317, 409 P.3d 1 (2018).

When reviewing jury instruction challenges, we consider "'"jury instructions as a whole, without focusing on any single instruction, in order to determine whether they properly and fairly state the applicable law or whether it is reasonable to conclude that they could have misled the jury."'" *State v. Butler*, 307 Kan. 831, 843, 416 P.3d 116 (2018).

11

Quillen has properly preserved his jury instruction challenge because he objected at the instruction conference and reiterated this objection in his motion for new trial. The primary point of contention between the parties is whether the instructions were legally appropriate—more specifically, whether substantive due process required the district court to give Quillen's requested instruction. We use unlimited review to determine whether an instruction was legally appropriate. *State v. Johnson*, 304 Kan. 924, 931, 376 P.3d 70 (2016). Whether Quillen's due process rights were violated is also a question of law subject to unlimited review. *In re Care & Treatment of Ellison*, 305 Kan. 519, 533, 385 P.3d 15 (2016).

Quillen argues that substantive due process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, required the district court to give his requested instruction. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The United States Supreme Court has "long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, 'guarantees more than fair process.'" *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258, 138 L. Ed. 2d 772 [1997]). "The Clause also includes a substantive component that 'provides heightened protection against government interference with certain fundamental rights and liberty interests.'" *Troxel*, 530 U.S. at 65 (quoting *Glucksberg*, 521 U.S. at 720).

"Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992). "[C]ivil commitment for any purpose constitutes a significant deprivation of liberty that requires due process

12

protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979). Therefore, involuntary civil commitment proceedings must balance this liberty interest with the State's legitimate interests in protecting the public from dangerous individuals and providing care for citizens who cannot care for themselves. See 441 U.S. at 425-26.

*Substantive Due Process Requires the State to Show at a Transitional Release Hearing That Respondent Continues to Suffer a Mental Abnormality Making it Difficult to Control Behavior and That Respondent Remains Dangerous*

To strike the proper balance between Quillen's liberty interest and the State's legitimate interest in protecting the public, and ultimately to determine the validity of the jury instructions here, we must first examine the statutory requirements for initial commitment and transitional release under the KSVPA. Then, we must determine the appropriate standard to be applied at transitional release hearings, consistent with the protections afforded under the Fifth and Fourteenth Amendments. Finally, we must test the jury instructions under this standard to determine their legal propriety.

*KSVPA's Requirements for Initial Commitment and Transitional Release*

Before 2018, the KSVPA defined "sexually violent predator" as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence." K.S.A. 2017 Supp. 59-29a02(a). Therefore, to initially commit a respondent as a sexually violent predator, the KSVPA's language expressly required the State to prove three elements beyond a reasonable doubt: (1) the respondent had been convicted of or charged with a sexually violent offense, (2) the respondent suffered from a mental abnormality or personality disorder, and (3) the mental

13

abnormality or personality disorder made the respondent likely to engage in repeat acts of sexual violence. K.S.A. 2017 Supp. 59-29a02(a); K.S.A. 2017 Supp. 59-29a07(a).

In 2002, the United States Supreme Court held that substantive due process required the State also prove that respondents have serious difficulty controlling their dangerous behavior before civilly committing them. *Crane*, 534 U.S. at 413. Our court later incorporated this holding into the initial commitment standard for respondents under the KSVPA. *In re Care & Treatment of Williams*, 292 Kan. 96, 106, 253 P.3d 327 (2011). In 2018, the Kansas Legislature amended the definition of sexually violent predator to expressly include *Crane*'s holding. L. 2018, ch. 94, § 1; see K.S.A. 2018 Supp. 59-29a02(a).

Once the State has proven beyond a reasonable doubt that the respondent is a sexually violent predator under the KSVPA at an initial commitment hearing, the respondent is committed to the custody of the Secretary of KDADS "until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large." K.S.A. 2019 Supp. 59-29a07(a). The KSVPA provides for annual reviews of a respondent's current mental condition, and those reviews are forwarded to the district court that originally committed the respondent. The Secretary must also provide the respondent with annual written notice of the respondent's right to petition for release over the Secretary's objection. K.S.A. 2019 Supp. 59-29a08(a). A respondent in secure confinement may only petition for transitional release, not conditional release or final discharge. K.S.A. 2019 Supp. 59-29a08(b).

If a respondent in secure confinement contests his or her annual review, the district court holds a hearing to determine whether the respondent has shown probable cause to believe his or her mental abnormality or personality disorder has significantly changed so that the respondent is safe to be placed in transitional release. K.S.A. 2019 Supp. 59-

14

29a08(d). If the court finds the respondent has met this burden, it then sets a hearing for transitional release. At this transitional release hearing, the State has the burden to show beyond reasonable doubt that the respondent's mental abnormality or personality disorder remains such that he or she is not safe to be placed in transitional release and if transitionally released is likely to engage in repeat acts of sexual violence. K.S.A. 2019 Supp. 59-29a08(g).

*Due Process Requirements at the Transitional Release Hearing*

The KSVPA does not expressly require the State to prove at a transitional release hearing that respondent continues to suffer a mental abnormality making it difficult to control behavior, as was required at the initial commitment. Rather, the KSVPA requires the State to prove that the respondent's mental abnormality or personality disorder *remains such* that he or she is not safe to be placed in transitional release and if transitionally released is likely to engage in repeat acts of sexual violence. Despite this language, Quillen argues that principles of substantive due process require the State to show at a transitional release hearing that the respondent has serious difficulty controlling his or her behavior.

In support of this contention, Quillen relies on *Hendricks* and *Crane*. In *Hendricks*, the United States Supreme Court held that the KSVPA's definition of "mental abnormality" satisfied substantive due process requirements for the involuntary civil commitment of persons charged with or convicted of sexually violent offenses. *Hendricks*, 521 U.S. at 358. The Court explained that to comport with substantive due process, civil commitment statutes like the KSVPA must limit involuntary commitment to "those who suffer from a volitional impairment rendering them dangerous beyond their control." 521 U.S. at 358. The Court held the KSVPA satisfies this requirement because it couples a finding of future dangerousness with a finding of "a 'mental abnormality' or

15

'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior. Kan. Stat. Ann. § 59-29a02(b) (1994)." 521 U.S. at 358. The Court found that the KSVPA's "precommitment standard of a 'mental abnormality' or 'personality disorder'" sufficiently "narrow[ed] the class of persons eligible for confinement to those who are unable to control their dangerousness." 521 U.S. at 358.

Several years later, the Court revisited *Hendricks* and the criteria for involuntary civil commitment in *Crane*. There, the Court held that substantive due process requires the State to show at an initial commitment hearing that an individual has serious difficulty controlling his or her behavior. *Crane*, 534 U.S. at 411-14. According to the Court, "*Hendricks* underscored the constitutional importance of distinguishing a dangerous sexual offender subject to civil commitment 'from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings.'" 534 U.S. at 412. While *Hendricks* did not require the State "*always* to prove that a dangerous individual is *completely* unable to control his behavior" as a condition precedent to involuntary commitment, neither could the State dispense with the requirement to demonstrate lack of control altogether. 534 U.S. at 411-12. *Crane* declined to precisely define "lack of control" in the context of involuntary civil commitment. Instead, it held that substantive due process protections are satisfied where the State provides proof of the respondent's serious difficulty controlling his or her behavior and such evidence, when coupled with the nature of the psychiatric diagnosis and severity of the mental abnormality, distinguishes the dangerous sexual offender from a dangerous but typical recidivist:

> "[In *Hendricks*,] we did not give to the phrase 'lack of control' a particularly
> narrow or technical meaning. And we recognize that in cases where lack of control is at
> issue, 'inability to control behavior' will not be demonstrable with mathematical
> precision. It is enough to say that there must be proof of serious difficulty in controlling
> behavior. And this, when viewed in light of such features of the case as the nature of the

16

psychiatric diagnosis, and the severity of the mental abnormality itself, must be sufficient to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." *Crane*, 534 U.S. at 413.

The Court of Appeals embraced Quillen's position that *Hendricks* and *Crane*, along with this court's decision *In re Care & Treatment of Williams*, require the State to show a respondent continues to have serious difficulty controlling behavior in order to preclude transitional release. In reaching this conclusion, the panel relied on two passages from *Hendricks* where the United States Supreme Court suggested the KSVPA's procedures preclude continued confinement if the State can no longer satisfy its burden under the initial confinement standard.

Indeed, in describing the operation of the KSVPA's review procedures, *Hendricks* stated that the KSVPA requires the State to satisfy the same burden at a review hearing as at an initial commitment hearing:

> "'Once an individual was confined, the [KSVPA] required that "[t]he involuntary detention or commitment . . . shall conform to constitutional requirements for care and treatment." [K.S.A.] 59-29a09. Confined persons were afforded three different avenues of review: First, the committing court was obligated to conduct an annual review to determine whether continued detention was warranted. [K.S.A.] 59-29a08. Second, the Secretary was permitted, at any time, to decide that the confined individual's condition had so changed that release was appropriate, and could then authorize the person to petition for release. [K.S.A.] 59-29a10. Finally, even without the Secretary's permission, the confined person could at any time file a release petition. [K.S.A.] 59-29a11. *If the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement*.'" *Quillen*, 57 Kan. App. 2d at 416 (quoting *Hendricks*, 521 U.S. at 353).

17

And, in analyzing whether the KSVPA violated double jeopardy and the constitutional prohibition against ex post facto laws, the *Hendricks* Court provided a similar characterization of the KSVPA:

> "'Furthermore, commitment under the [KSVPA] is only potentially indefinite. The maximum amount of time an individual can be incapacitated pursuant to a single judicial proceeding is one year. [K.S.A.] 59-29a08. *If Kansas seeks to continue the detention beyond that year, a court must once again determine beyond a reasonable doubt that the detainee satisfies the same standards as required for the initial confinement.* This requirement again demonstrates that Kansas does not intend an individual committed pursuant to the [KSVPA] to remain confined any longer than he suffers from a mental abnormality rendering him unable to control his dangerousness.'" *Quillen*, 57 Kan. App. 2d at 416-17 (quoting *Hendricks*, 521 U.S. at 364).

Based on these two passages, the Court of Appeals concluded that "[i]n finding [the KSVPA] constitutional, the *Hendricks* Court interpreted the [KSVPA] to require courts to utilize the same standard of proof for annual KSVPA review proceedings that it utilizes in original commitment proceedings." *Quillen*, 57 Kan. App. 2d at 418. The panel went on to explain that *Crane* and *In re Care & Treatment of Williams* established the standard of proof required at an initial commitment proceeding—a standard that requires the State demonstrate the individual has difficulty controlling behavior. Reading *Hendricks* together with *Crane* and *In re Care & Treatment of Williams*, the panel held "the State was constitutionally required to prove beyond a reasonable doubt that Quillen would have serious difficulty controlling his behavior if transitionally released." 57 Kan. App. 2d at 418.

In contrast, the State argues that the quoted passages from *Hendricks* do not compel the panel's conclusion. It asserts the *Hendricks* Court was simply observing "what the [KSVPA] require[s], not . . . holding that the Constitution mandates identical criteria for initial commitment and a later denial of transitional release." Instead, the State

18

contends that *Hendricks* found that the KSVPA's standard for transitional release comports with due process. Further, the State observes that the statutory standard for transitional release at the time of *Hendricks* was similar to the current statutory standard, which does not expressly require proof of the respondent's inability to control his or her behavior. Compare K.S.A. 59-29a08 (Furse 1994) ("The burden of proof at the hearing shall be upon the state to prove beyond a reasonable doubt that the committed person's mental abnormality or personality disorder remains such that the person is not safe to be at large and if released is likely to engage in acts of sexual violence."), with K.S.A. 2019 Supp. 59-29a08(g) ("The burden of proof at the hearing for transitional release shall be upon the state to prove beyond a reasonable doubt that the person's mental abnormality or personality disorder remains such that the person is not safe to be placed in transitional release and if transitionally released is likely to engage in repeat acts of sexual violence."). Therefore, the State concludes that *Hendricks* confirms that substantive due process principles do not compel a "lack of control" showing in order to deny transitional release.

While the *Hendricks* Court does describe the KSVPA as imposing the same standard at a transitional release hearing as at an initial commitment hearing, both the Court of Appeals and the State place too much weight on these passages. *Hendricks* did not examine the constitutionality of the standard of proof required at annual review hearings or transitional release hearings under the KSVPA. In the first *Hendricks* passage quoted by the panel, the Supreme Court was simply describing the KSVPA before addressing any challenges to its constitutionality. In the second passage, the Court was explaining why the potential for indefinite commitment under the KSVPA is not evidence of punitive intent in determining whether proceedings under the KSVPA are civil or criminal. At best, the quoted provisions merely suggest due process might be satisfied by using the same standard at both the initial and review hearings, but they do not tell us whether due process *requires* the standard to be the same.

19

While the Court of Appeals and both parties rely almost exclusively on *Hendricks* and *Crane* to support their respective positions, neither decision addresses the issue before us:  the applicable legal standard for *continued* commitment of a sexually violent predator under the Fifth and Fourteenth Amendments. Fortunately, other United States Supreme Court jurisprudence addressing involuntary commitment clarifies this standard.

In *O'Connor v. Donaldson*, 422 U.S. 563, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975), Donaldson was committed to confinement as a mental patient beginning in 1957. Fifteen years later, Donaldson sued his custodians, alleging his continued confinement violated his substantive due process rights. At trial, the jury awarded damages to Donaldson after finding that his custodians had intentionally and maliciously deprived him of his constitutional right to liberty by continuing his initial commitment for years on end, even though he posed no danger to himself or others. On review, the Supreme Court found that Donaldson's mental impairment "does not itself establish a constitutionally adequate purpose for the confinement." 422 U.S. at 574. The Court explained that continued confinement based on a mental health diagnosis, without an associated risk of harm to self or others, cannot survive constitutional scrutiny:

> "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." 422 U.S. at 575.

Importantly, *O'Connor* further observed that *continued* commitment cannot be justified based on a constitutionally valid basis for Donaldson's initial commitment because even if initially permissible, such commitment "could not constitutionally continue after that

20

basis no longer existed." 422 U.S. at 574-75. In other words, the constitutionally adequate basis that justified initial commitment must still be present in order to justify ongoing or continued commitment under the Due Process Clause.

Likewise, in *Jones v. United States*, 463 U.S. 354, 103 S. Ct. 3043, 77 L. Ed. 2d 694 (1983), the Court examined whether due process compelled the District of Columbia to release petitioner from his commitment to a mental hospital because his hospitalization exceeded the term of incarceration he might have served in prison but for his acquittal by reason of insanity. *Jones* acknowledged that due process "'requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.'" 463 U.S. at 368 (quoting *Jackson v. Indiana*, 406 U.S. 715, 738, 92 S. Ct. 1845, 32 L. Ed. 2d 435 [1972]). Since the purpose of civil commitment is to treat an individual's mental impairment and protect him and society from his potential dangerousness, the Court found the constitutional validity of continued confinement to be unrelated to the term of imprisonment an individual would have received but for acquittal due to insanity. *Jones*, 463 U.S. at 368-69. Instead, *Jones* echoed the principle espoused in *O'Connor* that continued confinement satisfies due process so long as the constitutionally permissible grounds for initial commitment continue to exist. In other words, commitment may continue "until such time as [the person committed] has regained his sanity or is no longer a danger to himself or society." 463 U.S. at 370. More recently, in *Foucha*, the Supreme Court reiterated the holding in *Jones* by confirming that involuntary civil commitment may continue "as long as [the committed persons are] both mentally ill and dangerous, but no longer." 504 U.S. at 77.

These cases stand for the proposition that the State's continued involuntary commitment of a sexually violent predator under the KSVPA does not violate substantive due process as long as the sexually violent predator remains both mentally ill and dangerous. Neither *Hendricks* nor *Crane* alter this due process standard. Instead, these

21

decisions merely articulate the showing necessary to establish that a person has a mental illness under the first prong of this due process test. More specifically, "*Crane* and *Hendricks* rephrased the general constitutional standard for civil commitment of insanity acquittees and other candidates for civil commitment to clarify that proof of mental illness embraces proof of a mental condition that makes it difficult to control one's dangerous behavior." *Richard S. v. Carpinello*, 589 F.3d 75, 83 (2d Cir. 2009).

Accordingly, at a transitional release hearing, due process principles require the State prove that respondent continues to meet the criteria justifying the initial commitment—specifically, that (1) respondent has a mental abnormality that causes serious difficulty in controlling behavior; and (2) that respondent remains dangerous as a result of such abnormality, i.e., is likely to commit repeat acts of sexual violence in transitional release. This standard is particularly fitting for a transitional release hearing under the KSVPA because to reach this stage of the proceedings, the respondent must have already shown probable cause to believe he or she is safe to be placed in transitional release. K.S.A. 2019 Supp. 59-29a08(d); K.S.A. 2019 Supp. 59-29a10(a)(1). We note that Quillen himself did not show probable cause, but the State waived this initial probable cause determination or stipulated to such a determination as part of Quillen's consent decree. Thus, in Quillen's transitional release hearing, the State carried the burden to show he continued to meet the criteria for initial commitment.

We note that the State relies on *Burch*, 2017 WL 3947430, at *5, for the proposition that no lack-of-control showing is required at the transitional release hearing. But as the panel in *Quillen* acknowledged, *Burch* did not examine the due process requirements governing the transitional release hearing. *Quillen*, 57 Kan. App. 2d at 418. Instead, *Burch* examined only the statutory language governing transitional release hearings to determine whether the State had provided sufficient evidence that the

22

respondent was not safe to be placed on transitional release. *Burch*, 2017 WL 3947430, at *4-6. As such, *Burch* is inapposite.

Ultimately, we agree with the Court of Appeal's conclusion that the State was constitutionally required to prove that Quillen would have serious difficulty controlling his behavior if transitionally released, though we reach this conclusion for different reasons than those relied on by the panel. We conclude that the State's continued involuntary commitment of a sexually violent predator under the KSVPA does not violate substantive due process as long as the individual remains both mentally ill and dangerous. When a respondent shows probable cause that either (or both) of these criteria are no longer present, the State must again prove the respondent is still both mentally ill and dangerous under the standard established in *Hendricks* and *Crane*. Failure to make such a showing at the transitional release hearing confirms the respondent no longer possesses the characteristics distinguishing a dangerous sexual offender from the dangerous but typical recidivist convicted in an ordinary criminal case, and denying transitional release under such circumstances runs afoul of well-established, fundamental liberty interests protected by the Constitution.

*The Jury Instructions Were Legally Proper*

Our holding regarding the appropriate standard for transitional release hearings does not resolve this appeal, however. After finding that substantive due process required the State to prove Quillen continued to have serious difficulty controlling his behavior, the Court of Appeals held that the district court's failure to give his requested instruction was reversible error. The State contests the panel's subsequent holding. The State contends that even if it had to prove Quillen would have serious difficulty controlling his behavior if transitionally released, substantive due process does not require district courts to give an instruction explicitly telling the jury to make this finding. Instead, the State

23

asserts that the jury would have had to necessarily and implicitly find that Quillen continued to have serious difficulty controlling his behavior when it concluded it was not safe to place him on transitional release. Thus, according to the State, the given instructions were constitutionally adequate and, therefore, legally proper.

>   *Substantive Due Process is Satisfied When the Jury Instructions Necessarily Imply a Lack-of-Control Finding*

Several other jurisdictions have addressed whether *Crane* mandates a jury instruction on the lack-of-control finding. The majority of states have held that *Crane* does not compel a separate instruction and/or a separate finding that the respondent has serious difficulty in controlling behavior. *Richard S.*, 589 F.3d at 83. Instead, these courts have held that the language of their state civil commitment statutes for sexually violent predators necessarily implies a finding that the respondent has serious difficulty in controlling behavior, and this implied finding satisfies *Crane.* See, e.g., *State v. White*, 891 So. 2d 502, 509-10 (Fla. 2004) (holding terms in Florida statute, when taken together, comply with *Crane* and jury instructions need only reflect language of statute); *In re Dutil*, 437 Mass. 9, 15, 18, 768 N.E.2d 1055 (2002) (finding that *Crane* requirement is met by Massachusetts statute that requires a finding that behavior indicating "'general lack of power to control . . . sexual impulses'" results in likelihood of harm to victim because of "'uncontrolled or uncontrollable desires'"); *In re Treatment and Care of Luckabaugh*, 351 S.C. 122, 144, 568 S.E.2d 338 (2002) ("Inherent within the mental abnormality prong of the Act is a lack of control determination . . . . The Act's requirements are the functional equivalent of the requirement in *Crane*."); *In re Detention of Thorell*, 149 Wash. 2d 724, 766, 72 P.3d 708 (2003) ("*Crane* does not require a separate jury finding that the [respondent] lacks control over behavior. Instead, the jury's finding of mental illness, coupled with a history of sexual violence, should be supported by sufficient evidence of serious difficulty controlling behavior."); *In re Commitment of Laxton*, 254 Wis. 2d 185, 208, 647 N.W.2d 784 (2002) (concluding separate instruction

24

on lack-of-control finding unnecessary because "requisite proof of lack of control is established by proving the nexus between the person's mental disorder and dangerousness").

Federal courts addressing the question have also concluded that *Crane* does not mandate a jury instruction specifically instructing the jury that it must find the respondent has serious difficulty controlling his or her behavior. See *Richard S.*, 589 F.3d at 84 (holding *Crane* does not mandate a specific instruction on lack of control); *Varner v. Monohan*, 460 F.3d 861, 864 (7th Cir. 2006) (holding that a finding that respondent has serious difficulty controlling behavior is implicit in jury's finding that it was "'substantially probable'" that respondent would engage in future sexually violent acts); *Brock v. Seling*, 390 F.3d 1088, 1090 (9th Cir. 2004) (holding that *Crane* is satisfied by jury's finding that respondent suffers from "'some combination of mental abnormality and personality disorder which in conjunction make him likely to engage in predatory acts of sexual violence'").

We agree with the rationale adopted by the majority of state courts and the federal courts that have addressed this issue. Although *Crane* requires the State to present proof that a respondent has serious difficulty controlling his or her behavior, the Due Process Clause does not compel a separate jury instruction on this finding. *Hendricks* made clear that due process requires the State to distinguish the dangerous sexual offender subject to civil commitment from other criminals, and *Crane* clarified that this must be done by providing proof that the sexual offender suffers from a mental illness that causes him or her to have serious difficulty in controlling behavior. But both *Hendricks* and *Crane* declined to provide a precise standard for this lack-of-control determination, noting that the proof needed to show serious difficulty in controlling behavior would vary depending on the circumstances of each case. *Crane*, 534 U.S. at 413. *Crane* further acknowledged that "the States retain considerable leeway in defining the mental abnormalities and

25

personality disorders that make an individual eligible for commitment." *Crane*, 534 U.S. at 413. Thus, when the statutory language of a state civil commitment statute necessarily implies that the respondent has serious difficulty in controlling behavior and requires the State to provide proof of such, the jury instructions need only reflect this statutory language to satisfy due process.

*The Jury Instructions, Taken as a Whole, Necessarily and Implicitly Required the Jury to Find Quillen Had Serious Difficulty Controlling His Behavior*

We further conclude that the instructions given by the district court here, when taken as a whole, necessarily and implicitly required the jury to find that Quillen had serious difficulty controlling his behavior. Jury instruction Nos. 2 and 3 required the State to prove beyond a reasonable doubt that Quillen's "mental abnormality or personality disorder remains such that he is not safe to be placed in transitional release." This language, taken directly from K.S.A. 2019 Supp. 59-29a08(g), links the existence and current severity of Quillen's mental abnormality or personality disorder to safety, thus creating a nexus between his mental illness and his dangerousness. This nexus distinguishes him from the typical dangerous recidivist, as required by *Hendricks* and *Crane*. And to prove such a nexus exists, the State must necessarily provide evidence that Quillen's mental illness causes him to have serious difficulty controlling his behavior. See, e.g., *Laxton*, 254 Wis. 2d at 203 (holding "nexus between the [person's] mental disorder and the substantial probability that the person will engage in acts of sexual violence, necessarily and implicitly requires proof that the person's mental disorder involves serious difficulty for such person in controlling his or her behavior"). Indeed, the record is replete with such evidence here, and Quillen does not challenge its sufficiency on appeal.

Jury instruction No. 4 also defined "[m]ental abnormality" as "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the

26

person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others." This definition, which tracks the definition of mental abnormality set forth in K.S.A. 2019 Supp. 59-29a02(b), also creates a nexus between mental illness and dangerousness because it defines mental abnormality to include a predisposition to commit sexually violent acts and requires that this predisposition must be so prevalent that the respondent is dangerous to others. Including such a predisposition within the meaning of "mental abnormality" necessarily implies that the respondent's mental condition causes serious difficulty in controlling his behavior. See *People v. Williams*, 31 Cal. 4th 757, 774-77, 74 P.3d 779, 3 Cal. Rptr. 3d 684 (2003) (holding that California statute defining mental abnormality in terms almost identical to KSVPA implies serious difficulty in controlling behavior and adequately conveys *Crane*'s requirements to the jury).

Finally, jury instruction Nos. 2 and 3 required the State to prove that, "if transitionally released, [Quillen] is likely to engage in acts of sexual violence." See K.S.A. 2019 Supp. 59-29a08(g). Jury instruction No. 4 defined "[l]ikely to engage in repeat acts of sexual violence" as "the respondent's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety of others." See K.S.A. 2019 Supp. 59-29a02(c) (defining "'[l]ikely to engage in repeat acts of sexual violence'"). Such a high propensity for committing sexually violent acts is again indicative of respondent's serious difficulty in controlling behavior.

Based on these instructions, the jury would have necessarily and implicitly found Quillen's mental abnormality continued to cause serious difficulty in controlling his behavior when it reached its verdict that Quillen's mental abnormality or personality disorder remained such that he was not safe to be placed in transitional release, and if transitionally released, he was likely to engage in repeat acts of sexual violence. The standard for transitional release as set forth in K.S.A. 2019 Supp. 59-29a08, and included

27

in jury instruction Nos. 2 and 3, created a nexus between mental illness and dangerousness that necessarily implied that Quillen had serious difficulty controlling his behavior. This nexus was solidified by the definition of mental abnormality as set forth in K.S.A. 2019 Supp. 59-29a02(b) and the definition of "'[l]ikely to engage in repeat acts of sexual violence,'" as set forth in K.S.A. 2019 Supp. 59-29a02(c), both of which were incorporated into jury instruction No. 4. Taken as a whole, these instructions necessarily required the State to prove and the jury to find that Quillen had serious difficulty controlling his behavior. As such, the instructions survive constitutional scrutiny under the Due Process Clause and the standards espoused in *Hendricks* and *Crane*. Accordingly, we find the jury instructions were legally appropriate and conclude that the district court did not err in rejecting Quillen's additional or alternate instructions.

CONCLUSION

In summary, we affirm the Court of Appeals holding that due process considerations required the State to demonstrate at the transitional release hearing that Quillen continued to suffer a mental abnormality that created serious difficulty controlling his behavior. However, we find the district court's instructions were legally proper because they necessarily required the State to prove and the jury to find that this standard had been met. Therefore, we reverse the Court of Appeals holding that the district court's instructions failed to comport with due process and constituted reversible error, and we affirm the judgment of the district court based on the jury verdict.

Judgment of the Court of Appeals vacating and remanding to the district court is affirmed in part and reversed in part, and the judgment of the district court is affirmed.

28

LORI A. BOLTON FLEMING, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Fleming was appointed to hear case No. 120,184 under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution to fill the vacancy on the court by the retirement of Justice Carol A. Beier.